USDC SCAN INDEX SHEET

















LMM    12/1/98    12:13

3:98-CR-00519   USA V. BOGART

*41*

*CROBJ.*

ORIGINAL

FILED

98 NOV 30 PM 3:34

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: L. Mitchell

1  John Mitchell
   State Bar No. 032237
2  2445 5th Avenue, #200
   San Diego, CA  92101
3  Ph. 619-237-9155
   Fax 619-237-0128
4

5  Counsel for Defendant
   RUSSELL J. CONTE
6

7

8              IN THE UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10 UNITED STATES OF AMERICA,     )   CR Case No. 98-0519-JM
                                 )   Sentencing: 12/18/98
11      Plaintiff,               )              8:30 a.m.
                                 )   DEFENDANT'S
12      v.                       )   OBJECTIONS TO PRE-
                                 )   SENTENCE REPORT
13 RUSSELL J. CONTE,             )
                                 )
14      Defendant.               )
                                 )
15 ─────────────────────────────

16      COMES NOW the DEFENDANT, RUSSELL J. CONTE (CONTE), by and through

17 counsel undersigned, and hereby files his Objections to the

18 Presentence Investigation Report (PSR).

19      1.  **Pages 2 - 4, The Offense Conduct.**  The offense conduct

20 description makes it sound as if CONTE **ab initio**, developed the

21 scheme, when in fact it was a scheme devised by LYNN BOGART and CARMEN

22 LUCCI.  Moreover, the description of CONTE'S conduct makes it appear

23 as if MURDOCK reasonably relied on CONTE, when in truth, MURDOCK had

24 a chief financial officer, HUGO BOREN, who was involved in the

25 discussions, and in fact, advised MURDOCK **against** the subject

26 investment.  According to CONTE, BOREN indicated that he thought it

27 sounded like a good idea but did not know much about the business;

28 thus he was against the investment and told MURDOCK as such.

1  MURDOCK, rather than relying on his long-time trusted financial

2  officer, relied on CONTE, who, as known to MURDOCK, was a convicted

3  felon, convicted of defrauding others.

4      In fact, CONTE met BOGART and LUCCI for the first time when

5  MURDOCK MET THEM IN Utah IN 1993. Attending that meeting was HUGO

6  BORNE. At that meeting, or soon after, BOREN expressed to MURDOCK and

7  CONTE his suspicions concerning the investment because he believed

8  that LUCCI was dressed like and acted like a mobster; LUCCI wore a

9  full-length mink coat. This was not a situation of MURDOCK relying

10 merely on CONTE; rather, MURDOCK, in his typical style as owner of

11 NATURE'S WAY, talked to not only CONTE, but to BORNE and others for

12 advice as to what he should do. {NATURE'S WAY, CONTE believes, is the

13 world's largest manufacturer of vitamins and other supplements.} Thus,

14 statements such as "more" persuasion by RUSSELL," PAGE 3, LINE 32, is

15 at best misleading because MURDOCK continued to rely not only on

16 CONTE, but on others. It was not until MURDOCK had paid $1,280,000

17 net to BOGART (200 + 650 - 22+650 = 1,280) that CONTE became aware of

18 the fraudulent scheme perpetrated on MURDOCK and CONTE by BOGART and

19 LUCCI. See plea agreement, pg. 8, para. 4. Before that time, both

20 CONTE and MURDOCK went to San Diego to check out BOGART'S business

21 practices, and BOGART defrauded both CONTE and MURDOCK by showing

22 storage containers with boxes of paper which BOGART claimed evidenced

23 that the investment was valid and solid.

24      At page 4, line 13, it is indicated that CONTE and BOGART were

25 to "split the net proceeds of MURDOCK'S final investment." A point of

26 clarification is in order: the proceeds were divided, not split

27 equally.

28                                    2

2.    <u>Page 4, Victim Impact Statement</u>.    MURDOCK'S reliance on CONTE was unreasonable.    <u>See</u> discussion at para. 6, <u>infra</u>.

3.    <u>Page 6-8, line 27, Criminal Convictions and Criminal History Computation</u>.    By order dated September 29, 1998, copy attached as <u>EXHIBIT A</u>, the District Court Judge in the Utah state case vacated the judgment and conviction.    Thus, there is no Utah state judgment and conviction.    <u>See</u>  <u>U.S.S.G.</u>  <u>§4A1.2(a)</u>  (prior  sentence  defined), application note 6 (vacated convictions).    <u>See</u> <u>e.g.</u>, <u>U.S. v. Guthrie</u>, 931 F.2d 564, 570-72 (9th Cir. 1991) (vacated state conviction not / counted).    Therefore, CONTE does not receive 1 point for a Utah state conviction as indicated in the PSR.

Under Application Note 6, <u>supra</u>, we find references to sentences, "Reversed, Vacated, or Invalidated Convictions."    The note states in part:    "Sentences resulting from convictions that (A) have been reversed  or  vacated  <u>because  of  errors  of  law</u>  or  because  of subsequently discovered evidence exonerating the defendant ...."    As evidenced by CONTE'S "Motion to Set Aside Plea of Guilty and Judgment of Conviction," <u>EXHIBIT B</u>, page 1, para. 1, filed recently in the Utah state court, CONTE claimed that the Utah sentence should be vacated because of an error in law, the motion stating in part:

> The plea did not conform with requirements of the Utah Rules of Criminal Procedure under Rule 11 and the plea was an involuntary plea and unconstitutional pursuant to the United States Constitution and Utah Constitution.

(Noteworthy  also  is  the  fact  that  contrary  to  the  PSR,  CONTE "completely  paid  off  in  full  the  restitution  and  victim,  Rex Henderson, has no objection to the setting aside of the plea." <u>Id</u>., para. 2.    <u>See</u> PSR at 6-7.)    Based on the motion and memorandum in

1  support of the motion, the Utah state court vacated the sentence.
2  EXHIBIT C.

3      In addition, as to the Utah federal case, page 7 of the PSR, the
4  sentence in this case was modified from six months incarceration to
5  six weeks incarceration. See EXHIBITS D and E, Motion to Modify
6  Sentence and transcript, respectively.    Therefore, under U.S.S.G.
7  §4A1.2(b)(2), DEFENDANT is to receive 1 point, not 2 points.    Section
8  4A1.1(b) causes an additional 2 points "for each prior sentence of
9  imprisonment of at least sixty days ...."  But §4A1.2(b)(2) states
10 that "If part of a sentence of imprisonment was suspended, 'sentence
11 of imprisonment' refers only to the portion that was not suspended."
12 "Sentence of  imprisonment" means  "a  sentence of  incarceration."
13 §4A1.2(b)(1).  See also, §5C1.1(c)(1), (2) and (3), Imposition of Term
14 of Imprisonment, which makes clear that a "sentence of imprisonment"
15 does not include "intermittent confinement, community confinement, or
16 home detention," all of which can be substituted for a "sentence of
17 imprisonment," meaning that they do not equate to a "sentence of
18 imprisonment."    In other words, the six weeks for which CONTE was
19 sentenced by the federal court in Utah to the Community Treatment
20 Center is not included as a "sentence of imprisonment."

21     In the federal case in Utah, on September 24, 1992, CONTE filed
22 a Motion to Modify Sentence, EXHIBIT D, stating that "This motion is
23 based upon the information from the defendant's treating physician to
24 be submitted to the court and counsel prior to the hearing which
25 indicated that defendant's diagnosed mental condition has deteriorated
26 and good cause exists to place the defendant in confinement other than
27 / / / /

28                                    4

the Davis County Jail." At pages 6 and 7 of the transcript, <u>EXHIBIT</u> <u>E</u>, the court stated:

> The report from the doctor is one of serious portent and deserves the consideration which you've requested. I've talked with the probation agent. <u>I'm determined to correct the three months in jail, jail type facility, to six weeks</u>, which would mean he had completed that, and then six weeks in the CTC ["Community Treatment Center"/"Community Confinement"] and then three months in a home. (Emphasis added.)

The district court suspended about six weeks of imprisonment; the three months/12 week sentence of imprisonment was changed to six weeks. (Three months is about 12 weeks; less six weeks leaves six weeks of imprisonment.) Under <u>§4A1.1(b)( and (c)</u>, CONTE'S sentence of imprisonment was six weeks, which is about 45 days, which is less than 60 days; thus, CONTE receives 1 point for the Utah federal conviction. The criminal history computation, then, is 1 plus 2 equals 3, which places DEFENDANT in Criminal History Category II, not Category III.

CONTE objects to the IRS agent's characterization at PSR page 8 that the false tax returns were related to the insurance claim. There was absolutely no relation.

4. <u>Page 9-11, Health/Substance Abuse/Identifying Characteristics</u>. The IRS PSR points out an alleged discrepancy between CONTE'S insurance claims - CONTE is spending his time "mostly in bed due to panic attacks" (sic) and CONTE'S travel. An understanding of the bi-polar condition is required: up or down, no in between. When depressed, CONTE spends days at a time in bed. When manic, CONTE cannot sit still. He might be depressed for days and at other times manic for days. In the extreme, the manic phase results

5

in panic attacks.    (When he is in bed it is due to the depressed phase, not the panic attacks.)

5.    <u>Page 13, Sentencing Summary/Guidelines Manual Used</u>.  The November 1, 1998 manual should be used, not the November 1, 1998 manual, given that CONTE is sentenced after November 1, 1998.    As discussed, <u>infra</u>, there are changes in the manual, effective November 1, 1998, with respect to diminished capacity.

6.    <u>Page 13, Offense Level Computation/Specific Offense Characteristic/Position of Trust</u>.    CONTE objects to the 2 point increase for position of trust under <u>U.S.S.G. §3B1.3</u>.    First, it should be noted that MURDOCK'S claimed reliance on CONTE was clearly unreasonable, given that MURDOCK knew, <u>inter alia</u>, that:

a.    CONTE had mental problems (diminished capacity/bipolar condition);

b.    CONTE had been convicted of a felony in federal court in Utah for failure to pay taxes and spent time in jail;

c.    CONTE was on probation for the federal offense;

d.    CONTE repeatedly failed in his business ventures.

Thus, it can hardly be said that MURDOCK, a sophisticated businessman who owned a multi-million dollar business, could have relied upon CONTE as his friend and/or financial advisor for sophisticated financial advice involving hundreds of thousands of dollars.    What we have here is a situation of, at best, friendship, which is not sufficient to cause a 2 level increase under §3B1.3. <u>See, e.g.</u>, <u>U.S. v. Pardo</u>, 25 F.3d 1187, 1190 (3rd Cir. 1994) and <u>U.S. v. Mullens</u>, 65 F.3d 1560 (11th Cir. 1995).    In <u>Pardo</u>, defendant's personal friendship with a bank manager played a role in bank fraud

6

but the friendship did not support a sentence enhancement because "at most, [defendant's] position as a friend allowed him an opportunity to commit an easily detectable wrong...." Likewise in <u>Mullens</u>, where defendant took advantage of personal friendships at a country club to solicit investors in a ponzi scheme he devised. The Eleventh Circuit rejected the enhancement because defendant "was not in a position of trust simply by virtue of developing ordinary social relationships."

Here, CONTE and MURDOCK were close friends. DEFENDANT was not licensed as an attorney, accountant, financial advisor, financial planner, stockbroker, or the like. Nor did DEFENDANT hold out to MURDOCK that CONTE held expertise in the area of business investments. Quite to the contrary, by CONTE'S track record of repeated failing businesses. CONTE was a perfect example as to how not to proceed in business matters. MURDOCK was on notice of CONTE'S personal (mental, emotional and financial) and professional (business/financial) shortcomings. Apparently, MURDOCK was, at the time, in need of a <u>friend</u>, and/or played out his role of loyal friend to CONTE. And, MURDOCK had a business manager, one who in fact was against the subject investments. That MURDOCK foolishly listened to CONTE, not to MURDOCK'S business manager, attests to MURDOCK'S lack of business judgment, not to any position of trust held by CONTE.

Moreover, CONTE disputes much of what MURDOCK claims, found at pages 4 and 5. A better understanding of the CONTE-MURDOCK relationship and its background is in order. CONTE and MURDOCK were very close friends, which friendship began circa 1992. MURDOCK was undergoing marital problems and in fact was separated from his wife and lived in a condo and kept begging CONTE to live in the condo with

7

him.    CONTE and MURDOCK would spend considerable time together, including not only working out, but going to basketball games and restaurants.    MURDOCK was very much taken back when CONTE married and did not have the time to spend.    In fact, CONTE and his family moved to Arizona for purpose of getting away from MURDOCK, given MURDOCK'S overbearing, controlling, and manipulative personality.    MURDOCK'S claim that CONTE "was the key to the entire fraud," page 4, line 36, is belied by the probation officer's recognition that but for BOGART and his scheme devised _ab initio,_ by BOGART, there would have been no involvement by CONTE in this MURDOCK fraud.

    MURDOCK did not hire CONTE as a "financial advisor at a salary of $4,000 per month," page 5, line 6.    Rather, MURDOCK, knowing of CONTE'S _sordid background and financial difficulties,_ agreed to loan CONTE about $50,000.    In fact, an amortization statement was prepared by MURDOCK'S CPA firm at MURDOCK'S request.    (CONTE has a copy.}  _See,_ _also,_ page 5, line 21, where MURDOCK claims he paid CONTE "over $50,000." Again, this was a loan.    CONTE has checks showing interest payments from CONTE to MURDOCK.

    CONTE also contests MURDOCK'S claims, page 5, lines 27 - 33.    In fact, other friends of MURDOCK and CONTE, suffered financial losses after investing with CONTE.    These friends and their fraud loss referenced in CONTE'S plea of guilty were all well-known to MURDOCK _before_ MURDOCK agreed to the BOGART investment.    CONTE denies that he told MURDOCK that he "had hidden $400,000 from the IRS during a tax investigation." He also denies that he told MURDOCK that CONTE pled guilty in the Utah federal / / / / / / / / / / / / / / / / / / / / / / / /

8

1 case, even though he was not guilty, and that he had been duped by

2 someone else.   Page 5, lines 3- 5.

3   CONTE also denies he wanted to be paid by gift or loan to avoid

4 problems with IRS, page 5, lines 16 - 18, and that he hid $400,000

5 from the IRS, page 5, lines 32 - 33.

6   Of the approximately $616,000 proceeds received by CONTE,

7 $250,000 of that was loaned by CONTE to BOB JONES, president and major

8 stockholder of Commonwealth Thrift, an FDIC thrift, and secured by

9 stock in that bank.  Circa early 19995, CONTE told MURDOCK that when

10 the note came due at the end of September, 19, 1995, CONTE would give

11 the proceeds to MURDOCK or if JONES could not pay the note off, CONTE

12 would assign the note to MURDOCK.   MURDOCK instructed CONTE to have

13 JONES sign the note with MURDOCK'S company, MI, LC, which was done in

14 November of 1995.   See Exhibit 5.   Commonwealth was to provide a

15 credit card program designed specifically for sub-prime borrowers.

16 However, some time in the middle of 1996, Commonwealth was taken over

17 by the FDIC regulators due to liquidity problems.   In effort to held

18 MURDOCK get his money back, CONTE  placed phone calls two or three

19 times a week for four years for follow-up, updates and brainstorming,

20 which should demonstrate CONTE'S post-offense rehabilitation.

21   7.   <u>Page 15, Factors That May Warrant Departure</u>.[1]   In the

22 Sentencing Commission's changes to the Guidelines, effective November

23

24    [1] CONTE recognizes that under local criminal rule <u>32.1(a)(7)</u>, his objections "should not

25 include arguments for aggravation or leniency, <u>unless based on claimed errors in the presentence</u>

26 <u>report</u>." (Emphasis supplied.)  Here CONTE disagrees with the probation officer's downward

27 departure analysis and therefore, provides some argument.

28 9

Sentencing Commission's changes to the Guidelines, effective November 1, 1998, the Commission shows greater deference for diminished capacity as a basis for downward departure.    The Commission has amended the diminished capacity section, §5K2.13 by Amendment No. 8, stating:

> This Amendment (A) address a circuit conflict by allowing a diminished capacity departure if there is sufficient evidence that the defendant committed the offense while suffering from a significantly reduced mental capacity, except under three circumstances [not applicable here]; and (B) adds an application note that defines "significantly reduced mental capacity to include both cognitive impairments (i.e., an inability to understand the wrongfulness of the conduct or to exercise the power of reason) and volitional impairments (i.e., an inability to control behavior that the person knows is wrongful), based on the decision in United States v. McBroom, 124 F.3d 533 (3rd Cir. 1997).

Under the old §5K2.13 we find:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public. (Emphasis supplied.)

Due to conflict in the circuits as to what constituted a non-violent offense, the Commission has amended this section to include violent as well as non-violent offenders, which amendment demonstrates the Commission's growing concern and greater deference for diminished capacity as a basis for downward departure. Moreover, even before the amendment to this section, it is clear that the courts gave great deference to diminished capacity with respect to non-violent offenders.

1    While it is true that the Commission provides for downward
2  departure "provided that the defendant's criminal history does not
3  indicate a need for incarceration to protect the public," this is not
4  to say that a downward departure is not warranted where some term of
5  incarceration will be served despite the departure.

6    The case of <u>U.S. v. Mary Ann Herbert</u>, 902 F.Supp. 827 (N.D. Ill.
7  1995) is instructive.  Herbert plead guilty to embezzlement and tax
8  fraud.   In order to "salvage her failing company," she started
9  gambling.   Winnings did not cover the debts.   Herbert embezzled
10  $70,000 from a pension fund.  Herbert's psychiatrist concluded that
11  Herbert suffers "an ongoing psychiatric illness ... [and] displays a
12  number of features which are often seen in individuals with mixed
13  personality states that include narcissistic, histrionic and
14  borderline features."   The psychiatrist further explained that
15  Herbert's illness "causes a depressed state prompting Herbert to
16  question her own worth, make poor decisions, and then offer excuses
17  to compensate for her shortcomings."   The court ordered a second
18  psychiatric evaluation to determine whether Herbert's psychological
19  difficulties contributed to her criminal actions. The court found that
20  Herbert had, in fact, been impaired at the time of the offense.   The
21  psychiatrist stated:

22              In my opinion, Ms. Herbert suffered cognitive
        difficulties (poor concept formation and poor ability
23      to understand or judge situations) and emotionally
        driven decision making.  Her behaviors and thought
24      patterns were influenced by her impaired mental
        condition which include a severe depressive disorder
25      compounded by a pathological gambling disorder and
        alcohol dependence.    The consequences of her
26      personality disorder which included her feelings of
        inadequacy (which impacted upon her ability to lead or
27      administer a corporation) resulted in extremely poor

28                              11

1

2

> decision-making which consequently led to the charge against her. Her inability to cope with the sequence of events resulted in her suicide attempt.

3

4

5

6

7

> Ms. Herbert's mental state at the time of the offense was extremely impaired. As a direct result of an active  depressive illness compounded by her mix personality state, her perception of her faults and weaknesses, in addition to her limited coping capacity and poor judgment subsequently resulted in a reduced mental capacity during the period of time immediately preceding, during, and after the offense.

8

9

10

11

12

13

Relying upon U.S. v. Lewinson, 988 F.2d 1005 (9th Cir. 1993) and U.S. v. Frazier, 979 F.2d 1227 (7th Cir. 1992), the district court granted Herbert's request for a downward departure, and although Herbert's total offense level was 13, she was placed on probation for a term of 42 months and placed on home confinement for the first six months of probation.[2]  In granting Herbert a downward departure, the court stated:

14

15

16

17

> In sum, all that Frazier and Section 5K2.13 require is that (1) the defendant suffered a diminished mental capacity at the time of the offense, and (2) the mental impairment contributed to the commission of the crime.

18

19

20

21

22

23

24

In addition, CONTE is entitled to a downward departure for post-offense rehabilitation/super acceptance of responsibility.  After the offense and prior to notice of a criminal investigation, CONTE caused MURDOCK to recover a substantial amount of his fraud loss: $200,000 in cash recovered.  CONTE also assigned to MURDOCK a note which CONTE believed was worth $250,000, secured by stock in a company but proved worthless, plus CONTE gave MURDOCK a note for the balance owed, plus

25

26

27

28

---

[2] The reported case does not state the number of levels

departed.  However, a review of the judgment indicates the Guideline calculation before

departure and reveals the sentence of probation/home confinement.

1  interest, approximate total amount of $2.5 million plus interest.

2  Downward departures for both post-offense and post-sentence

3  rehabilitation are permitted by the Ninth Circuit.  See, e.g., U.S.

4  v. Green, 152 F.2d 1202, 1206-08 (9th Cir. 1998) (post-sentence

5  rehabilitation downward departure affirmed; court recognizes, at 1206,

6  "no difference between post-offense rehabilitation and post-sentencing

7  rehabilitation).

8       CONTE claims the following early restitution/rehabilitation/

9  remorse/etc. factual basis:

10           a.    July, 1994.  CONTE paid MURDOCK $100,000;

11           b.    August, 1995.  CONTE paid MURDOCK $120,000, signed an

12  agreement to pay all monies back, and assigned a note to MURDOCK in

13  the amount of $250,000, secured by corporate shares and Commonwealth

14  Thrift, a California corporation.    See EXHIBIT F, a copy of the

15  assigned note, and EXHIBIT G, a copy of the note.

16           c.    February, 1998. Indictment.    Thus, July, 1994 and

17  August, 1995 are 43 and 30 months, respectively, prior to indictment.

18       See also U.S. v. McBroom, 991 F.Supp. 445 (D.N.Y. 1998) (on

19  remand district court departed downward one level for diminished

20  capacity and two levels for post-offense rehabilitation).

21       CONTE also raises additional grounds for departure and reserves

22  the right to present additional grounds by way of his pre-sentence

23  memorandum.   For example, the court should take into consideration

24  downward departure based on the fact that CONTE was not aware of the

25  grand scheme of BOGART and LUCCI when CONTE initially advised MURDOCK.

26  What CONTE did was fail to disclose to MURDOCK the fact that CONTE was

27  to receive a 10% commission on all monies paid over to BOGART and

28                                    13

LUCCI.   CONTE did not know, _ab initio_ that BOGART and LUCCI were perpetrating a fraud upon MURDOCK.   In other words, CONTE was suckered into the scheme, no less than MURDOCK.   _See, e.g.,_ Plea Agreement at page 8, para. r:

> _After_ Murdock made the $650,000 investment, _defendant found out that the whole investment scheme was a fraud._   Instead of telling Murdock, he demanded that Bogart make him a 50% partner in the proceeds of all future investments by Murdock. (Emphasis supplied.)

By this time, which was after MURDOCK had paid $1,280,000 net to BOGART: 200 + 650 - 220 + 650 = 1,280.   That post-_Koon_[3] the Ninth Circuit gives wide latitude to the district court in making a downward departure determination is best evidenced by the very recent case of _U.S. v. Sanchez-Rodriguez_, __ F.3d __, 1998 W.L. 81855 (9th Cir. 1998) (_en banc_).   In _Sanchez-Rodriguez_, decided November 20, 1998, the district court departed from a range of 77 - 99 months down to a 30-month sentence on grounds that: (1) the amount of drugs was small; (2) delay in charging and sentence; and (3) waiver of deportation hearing. The government agreed only as to (3) and appealed on (1) and (2), but the sentence was affirmed by the Ninth Circuit.

The probation officer should consider other grounds for downward departure, including the following:

a.   _Cumulative factors (singly and in combination)_, §5K2.0.

_See, e.g., U.S. Mena_, 968 F.Supp. 115 (E.D. N.Y. 1997) (downward departure 15 levels based on a number of factors singly and in combination, including §5K2.12, coercion and duress, because defendant was dominated, manipulated and pressured by his older brother).

---

[3] _Koon v. U.S._, 116 S.Ct. 2035 (1996).

14

1  Moreover, this court should take into consideration civil tax
2  penalties and interest imposed upon CONTE which factors are not taken
3  into consideration by the Guidelines.

4      b.   Extent of Defendant's Remorse is Demonstrated by
5  Defendant's Post-Offense Rehabilitation.   See, e.g., U.S. v.
6  Jaroszenko, 92 F.3d 486 (7th Cir. 1996).

7      c.   Koon departure review standards.   Under the 1999
8  edition, we find an amendment to §5K2.0: "This amendment (A)
9  incorporates into the general departure policy statement the principle
10 holding and key analytical points of the United States Supreme Court's
11 decision in Koon v. U.S., 518 U.S. 81 (1996); (B) removes the language
12 that is inconsistent with the Koon holding; and (C) generally enhances
13 the precision of the language of the policy statement."  (Amendment
14 #10 to 1999 edition.)

15     d.   Combination of individual characteristics.   U.S.S.G.
16 §5K2.0 (Old Amendment 508).   The Commission in its commentary to the
17 amendment noted that it was not foreclosing the possibility "in an
18 extraordinary case, that a departure could be based upon a combination
19 of individual offending characteristics."   59 Fed.Reg. 23608, 23610
20 (May 5, 1994).   See, e.g., U.S. v. Cook, 938 F.2d 149, 152-53 (9th
21 Cir. 1991) (court stated that where individual factors would not
22 justify departure, a combination of those same factors may constitute
23 mitigating circumstances justifying a departure).

24     e.   Other extenuating and mitigating circumstances.   See,
25 U.S. v. Brennick, 949 F.Supp. 32 (D. Mass. 1996) in which the district
26 court held that defendant's conduct in initially paying his
27 withholding taxes late before he stopped paying them at all, financial

28                                 15

conditions in the industry which contribute to the failure of the defendant's business, and the fact that the applicable Guideline overstated the seriousness of the offense, all justified a downward departure. Here, the loss/seriousness is overstated as to CONTE because CONTE was not aware of the scheme until after MURDOCK paid BOGART the second $650,000, at which time MURDOCK paid a net of $1,280,000: 200 + 650 - 220 + 650 = 1,280. See plea agreement, page 8, para. 12.

        f.   Extraordinary acceptance of responsibility. See e.g., U.S. v. Rogers, 972 F.3d 489, 493 (2nd Cir. 1992) (defendant turned himself in the day after committing the bank robbery); U.S. v. Brown, 985 F.2d 478, 482-83 (9th Cir. 1993) (same); U.S. v. Lieberman, 971 F.2d 989, 996 (3rd Cir. 1992) (defendant paid more in restitution than he actually owed, resigned from position at bank, explained how to detect improper transactions in the future); U.S. v. Miller, 991 F.2d 552, 553-54 (9th Cir. 1993) (remand to determine if extraordinary restitution justified departure).

The same facts that apply to CONTE'S post-conduct rehabilitation apply to this factor. See, e.g., U.S. v. Evans, 49 F.3d 109, 112-115 (3rd Cir. 1995) (remanding for resentencing; relying, in part, on amendment to U.S.S.G. §5K2.0 Commentary). In Evans, the Third Circuit, citing Gaskill, infra, held that a downward departure might be appropriate based on extraordinary acceptance of responsibility where defendant revealed his true identity to probation officer, which otherwise would have remained undiscovered.

        g.   Fair and reasonable sentence. See, e.g., U.S. v. Gaskill, 991 F.2d 82, 86 (3rd Cir. 1993) (court stated that "district

judges need not shrink, however, from utilizing departures when the

opportunity presents itself and when circumstances require such action

to bring about a fair and reasonable sentence."

 *See*, *e.g.*, <u>U.S. v. Gaskill</u>, 991 F.2nd 82, 86 (3rd Cir. 1991) in

which the court stated that "District judges need not shrink, however,

from utilizing departures when the opportunity presents itself and

when circumstances require such action to bring about a fair and

reasonable sentence."

 8. <u>Page 15-17, Probation Officer's Analysis/Justification</u>.

CONTE objects to the analysis/justification of the probation officer

in general and with the following particulars.  Murdock's investment

was not reasonably induced by any degree, much less to a "critical

degree by the trust [Murdock] had in the DEFENDANT...."  This is not

CONTE'S third criminal conviction overall; it is his second, and his

second felony conviction resulted in a sentence of imprisonment of 6

weeks.  CONTE does not have one prior misdemeanor, and as noted in

para. 2, <u>supra</u>, based on CONTE'S bi-polar disorder, the federal court

in Salt Lake City did modify CONTE'S sentence in 1992 to incarceration

of 45 days, that time having already been served.  While it is true

that CONTE'S "initial acts in the [subject] offense were more or less

simultaneous with his plea for modification" to the federal court in

Utah, and that CONTE was on supervision from the Utah federal case

"during the entire life of the instant offense," this should come as

no surprise, given CONTE'S bi-polar condition, which as Dr. Guernsey

will testify, contributed to the commission of the offense.

 9. <u>Page 17-18, Sentencing Recommendation</u>.

 Given the above objections, the Guideline calculation is as

follows:  Base offense level of 6, plus 13 for fraud loss, plus 2 for minimal planning, equals an adjusted offense level of 21.  21 less 3 for acceptance of responsibility is a total offense level of 18.  The Criminal History score is 3 for Criminal History Category II.  Thus, the Guideline range is 30-37 months.  In addition, CONTE is eligible for a downward departure based on diminished capacity under §5K2.13.  CONTE recommends substantial downward departure for diminished capacity and post-offense rehabilitation/super acceptance of responsibility

CONTE disagrees that his bi-polar manic/depressive condition is belied by his claim "that he spends almost all of his time in bed or at home."  One needs to fully understand the bi-polar condition to understand that an individual could be bedridden with deep depression for days at a time (the depressive phase) and at other times have spurts of energy and restlessness which would cause him to travel (the manic phase).  Moreover, CONTE's "more luxurious lifestyle than most" is not relevant.  That lifestyle is not based upon monies obtained as a result of the instant offense, but is based upon the fact that CONTE receives $8,000 in insurance proceeds.  While many of us would be more prudent with their finances, "saving for a rainy day," the fact that CONTE has chosen a comfortable lifestyle should not be a factor of consideration with respect to whether he truly suffered and continues to suffer from a bi-polar condition.  While CONTE can understand why some may view his bi-polar condition with a cynical eye, consider this: who in their right mind would agree to electric shock treatments in an attempt to defraud an insurance company?  Consider, too, the fact that the probation officer's distrust of CONTE'S serious bi-polar

1  condition is in effect a distrust of the diagnosis of Dr. Guernsey,
2  et al.   A better understanding of the manic depressive/bi-polar
3  condition is in order, and CONTE will submit medical further
4  information to the probation officer and court.

5      Finally, the probation officer misses the mark with respect to
6  the exception to a 5K2.13 diminished capacity departure: "provided the
7  criminal history does not indicate a need for incarceration to protect
8  the public."   The question here is not whether CONTE should be
9  incarcerated to protect the public, but for how long he should be
10 incarcerated to protect the public.  For example, at offense level 18,
11 Criminal History Category II, CONTE faces a Guideline range of 30-37
12 months.  With a six-level departure, CONTE receives an offense level
13 of 12, Zone C, and faces a Guideline range of 12-18 months. CONTE will
14 submit to the court a pre-sentence memorandum outlining what he
15 believes to be a fair sentence in this case.

16     10. Page 18, Fine.   With a total offense level of 17 and a
17 Guideline range of 2, the fine range is $6,000 - $60,000.

18     11. Sentencing Summary Chart.   For reasons stated above, the
19 total offense level is 18, Criminal History Category II, with a range
20 of 30-37 months before downward departure.

21

22 **EXHIBITS  A   Utah State court order**
   **B   Motion to Set Aside Plea of Guilty and**
23 **     Judgment of Conviction**
   **C   Vacate Sentence - Utah state court**
24 **D   Motion to Modify Sentence - Utah federal court**
   **E   Transcript - Utah federal court**
25 **F   Note - copy of assigned note**
   **G   Note - copy of note**
26

27

28                        19

DATED this __ day of November, 1998.

John Mitchell
2445 5th Avenue, #200
San Diego, CA  92101
Ph. 619-237-9155
Fax 619-237-0128

Copy of the foregoing mailed
this ___ day of November, 1998 date, to:

James Brannigan
Asst. U.S. Attorney
Federal Building
880 Front Street, Rm. 6293
San Diego, CA  92101-8893
Ph. 619-557-65769

Kenneth Ramsdell
Probation Officer
401 W. A,  Suite 500
San Diego, CA  92101
619-557-5261

a:clients\conte.obj

20



RANDALL GAITHER  #1141
Attorney for Defendant
321 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 531-1990

# IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY
# MURRAY DEPARTMENT, STATE OF UTAH

| | | |
|---|---|---|
| STATE OF UTAH, | ) | ORDER SETTING ASIDE PLEA |
| | ) | AND VACATING JUDGMENT |
| Plaintiff, | ) | OF CONVICTION |
| | ) | |
| vs. | ) | Judge BURTON |
| | ) | |
| RUSSELL JOHN CONTE, | ) | |
| | ) | Case No. 911001396 |
| Defendant. | ) | |

The above entitled matter came before the Honorable Judge Michael Burton on

the 29th day of September, 1998.  The State was present and represented by the Salt Lake

District Attorney's Office and the Defendant was present and represented by Randall

Gaither, Attorney at Law.  Based upon the Motion of the Defendant and good cause

appearing:

IT IS HEREBY ORDERED that based upon Rule 11 of the Utah Rules of Civil

Procedure, the plea of guilty is set aside and the Judgment and Conviction is vacated and

the matter ~~shall be set for further proceedings by the clerk of the Court.~~ *is dismissed.*
*UTFS*

*Exhibit 1 A*

DATED this 29 day of September, 1998.

JUDGE MICHAEL BURTON
District Court Judge

## DELIVERY CERTIFICATE

I hereby certify that on the _____ day of September, 1998, a true and correct

copy of the foregoing ORDER was delivered to:

SALT LAKE DISTRICT ATTORNEY'S OFFICE
231 EAST 400 SOUTH
SALT LAKE CITY, UTAH 84111

DATED this 29 day of September, 1998.

STATE OF UTAH        ) ss
COUNTY OF SALT LAKE  )
I, THE UNDERSIGNED, CLERK OF THE DISTRICT
COURT OF SALT LAKE COUNTY, UTAH DO HEREBY
CERTIFY THAT THE ANNEXED AND FOREGOING IS A
TRUE AND FULL COPY OF AN ORIGINAL DOCUMENT
ON FILE IN MY OFFICE AS SUCH CLERK.
WITNESS MY HAND AND SEAL OF SAID COURT
THIS 29 DAY OF September 19
CLERK OF THE DISTRICT COURT
BY: _____ DEPUTY

2

RANDALL GAITHER  #1141
Attorney for Defendant
321 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 531-1990

---

# IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY
# MURRAY DEPARTMENT, STATE OF UTAH

| | | |
|---|---|---|
| STATE OF UTAH, | ) | MOTION TO SET ASIDE PLEA OF |
| | ) | GUILTY AND JUDGMENT OF |
| Plaintiff, | ) | CONVICTION |
| | ) | |
| vs. | ) | Judge BURTON |
| | ) | |
| RUSSELL JOHN CONTE, | ) | |
| | ) | Case No. 911001396 |
| Defendant. | ) | |

The Defendant, Russell Conte, hereby moves the Court to set aside the plea of guilty entered on May 13, 1992, and to set aside sentence and vacate the Judgment and Conviction on that same date on the following grounds and reasons:

1. The plea did not conform with the requirements of the Utah Rules of Criminal Procedure under Rule 11 and the plea was an involuntary plea and unconstitutional pursuant to the United States Constitution and Utah Constitution.

2. The Defendant has completely paid off in full the restitution and the victim, Rex Henderson, has no objection to the setting aside of the plea.

3. Submitted herewith is a Memorandum of Law in support of the Motion to set aside the plea and a copy of the transcript of the Change Of Plea.

1



Exhibit B

4. The Defendant will submit an Affidavit of the Defendant concerning this

Motion.

DATED this ___ day of September, 1998.

RANDALL GAITHER
Attorney for Defendant

## MAILING CERTIFICATE

I hereby certify that on the ___ day of September, 1998, a true and correct

copy of the foregoing MOTION TO SET ASIDE PLEA OF GUILTY was mailed First

Class Mail, postage prepaid to:

    SALT LAKE DISTRICT ATTORNEY'S OFFICE
    231 EAST 400 SOUTH
    SALT LAKE CITY, UTAH 84111

DATED this ___ day of September, 1998.

2

RANDALL GAITHER #1141
Attorney for Defendant
321 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 531-1990

---

## IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY
## MURRAY DEPARTMENT, STATE OF UTAH

---

| | | |
|---|---|---|
| STATE OF UTAH, | ) | MEMORANDUM IN SUPPORT OF |
| | ) | MOTION TO SET ASIDE PLEA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge BURTON |
| | ) | |
| RUSSELL JOHN CONTE, | ) | |
| | ) | Case No. 911001396 |
| Defendant. | ) | |

---

### STATEMENT OF FACTS

1. The Information was filed on October 2, 1991, after having been transferred from the Salt Lake Circuit Court.

2. On May 13, 1992, the Defendant, Russell Conte, appeared before the Court with his attorney Randall Gaither and entered a change or plea.

3. A transcript of the Change of Plea Hearing is attached hereto as Exhibit A.

4. The Defendant plead guilty and was sentenced on May 13, 1992, to the offence of Attempted Forgery and the Court fined the Defendant $600.00 and suspended $75.00 jail and also ordered a payment of restitution.

1

5. The victim of the offence was Rex Henderson and Rex Henderson has been fully paid restitution and does not require a criminal conviction against the Defendant.

## POINT I

### THE COURT SHOULD GRANT THE DEFENDANT'S MOTION TO SET ASIDE

The Defendant, Russ Conte, was not examined concerning the entry of the plea by the Court pursuant to *Rule 11 of the Utah Rules of Criminal Procedure. Rule 11 of the Utah Rules of Criminal Procedure* states as follows:

The court may refuse to accept a plea of guilty or no contest,

and may not accept the plea until the court has found:

(a) if the defendant is not represented by counsel, he has knowingly waived his right to counsel and does not desire counsel;

(b) the plea is voluntarily made;

(c) the defendant knows he has rights against compulsory self-incrimination, to a jury trial, and to confront and cross-examine in open court the witnesses against him, and that by entering the plea he waives all of those rights;

(d) the defendant understands the nature and elements of the offense to which he is entering the plea; that upon trial the prosecution would have the burden of proving each of those elements

2

beyond a reasonable doubt, and that the plea is an admission of all

those elements;

    (e) the defendant knows the minimum and maximum sentence that

may be imposed upon him for each offense to which a plea is entered,

including the possibility of the imposition of consecutive sentences;

    (f) if the tendered plea is a result of a prior plea discussion

and plea agreement, and if so, what agreement has been reached; and

    (g) the defendant has been advised of the time limits for filing

any motion to withdraw a plea of guilty or no contest.

    In State v. Reyes, 876 P.2d 566, 239 Utah Adv. Rep. 9 (Ct.App 1994) the Court

stated:

> The trial court has abused its discretion as a matter of law if it does not permit a
> defendant to withdraw a plea that was not made in strict compliance with *Rule 11 of the*
> *Utah Rules of Criminal Procedure. State v. Smith*, 812 P.2d 470, 476 (Utah App. 1991),
> cert. denied, 836 P.2d 1383 (Utah 1992). "The purpose of Rule 11(5) and (7) is to assure
> that a plea of guilty or no contest is knowing and voluntary." A motion to withdraw a
> plea made prior to sentencing should generally be liberally granted, provided good cause
> is shown. *State v. Gallegos*, 738 P.2d 1040, 1042 (Utah 1987); *State v. Thorup,* 841 P.2d
> 746, 747 (Utah App. 1992), cert. denied, 853 P.2d 897 (Utah 1993).

    Here, the Court did not use an Affidavit or Statement In Advance Of Plea.  The

Defendant was not told about any specific date or time in which a motion to set aside the

plea was required to be filed.

    In *State v. Price*, 837 P.2d 578 (Ct. App. 1992), the Utah Court of Appeals

reviewed a plea in which the Defendant executed a statement of the Defendant and was

also advised of his right to move to set aside the plea within thirty days. The court overruled the motion to withdraw in that case and stated and recited other cases which indicated that *Rule 11(e) of the Utah Rules of Criminal Procedure* squarely places on trial courts the burden of insuring constitutional plea and that Rule 11 requirements be complied with when a plea is entered citing *State v. Maguire*, 830 P.2d 216 (Utah 1992), and the court noted that one Plea Affidavits are probably incorporated in the record they may form a basis for finding of a Rule 11 compliance. The court went on to note that the Utah Courts have required strict compliance with Rule 11.

The court also noted that *Utah Code Annotated* Section 77-13-6(2)(b), provides that a request to withdraw a plea of guilty or no contest shall remain within thirty days from the entry of the plea. The court noted that this limit must be construed in relation to Rule 11(5)(g) that indicates that a court must advise the Defendant of his time to file a motion to withdraw the plea of guilty. The court said that Rule 11(6) provides that the failure to advise the Defendant of the time limits for filing any motion to withdraw a plea of guilty is grounds for extending the time to file a motion under *Utah Code Annotated* Section 77-13-6.

DATED this ___14th___ day of September, 1998.

RANDALL GAITHER
Attorney for Defendant

4

RANDALL GAITHER  #1141
Attorney for Defendant
321 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 531-1990

# IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY
## MURRAY DEPARTMENT, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH, | ORDER SETTING ASIDE PLEA |
| | AND VACATING JUDGMENT |
| Plaintiff, | OF CONVICTION |
| | |
| vs. | Judge BURTON |
| | |
| RUSSELL JOHN CONTE, | |
| | Case No. 911001396 |
| Defendant. | |



The above entitled matter came before the Honorable Judge Michael Burton on

the 29th day of September, 1998. The State was present and represented by the Salt Lake

District Attorney's Office and the Defendant was present and represented by Randall

Gaither, Attorney at Law. Based upon the Motion of the Defendant and good cause

appearing:

IT IS HEREBY ORDERED that based upon Rule 11 of the Utah Rules of Civil

Procedure, the plea of guilty is set aside and the Judgment and Conviction is vacated and

the matter ~~shall be set for further proceedings by the clerk of the Court~~  is *dismissed.*
*MMB*

*Exhibit C*

1

DATED this 29 day of September, 1998.

JUDGE MICHAEL BURTON
District Court Judge

## DELIVERY CERTIFICATE

I hereby certify that on the _____ 29 day of September, 1998, a true and correct

copy of the foregoing ORDER was delivered to:

SALT LAKE DISTRICT ATTORNEY'S OFFICE
231 EAST 400 SOUTH
SALT LAKE CITY, UTAH 84111

DATED this _____ 29 day of September, 1998.

STATE OF UTAH    ) SS
COUNTY OF SALT LAKE )
I, THE UNDERSIGNED, CLERK OF THE DISTRICT
COURT OF SALT LAKE COUNTY, UTAH DO HEREBY
CERTIFY THAT THE ANNEXED AND FOREGOING IS A
TRUE AND FULL COPY OF AN ORIGINAL DOCUMENT
ON FILE IN MY OFFICE AS SUCH CLERK.
WITNESS MY HAND AND SEAL OF SAID COURT
THIS 29 DAY OF September 18
CLERK OF THE DISTRICT COURT
BY:_____ DEPUTY

2

RANDALL GAITHER   #1141
Attorney for Russell J. Conte
321 South 600 East
Salt Lake City, Utah 84102
Telephone:  (801) 531-1990

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

SEP 21 1992

By MARKUS B. ZIMMER, CLERK
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | MOTION TO MODIFY SENTENCE |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| RUSSELL J. CONTE, | ) | Case No. 91-CR-0267-A |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Defendant, Russell J. Conte hereby moves the Court to modify, correct or amend the previous judgment to substitute as punishment pursuant to Section 5C 1.1(E) of the Federal Sentencing Guidelines. A halfway house or other similar residence facility or home detention in lieu of the balance of the imprisonment of the Defendant in the Davis County Jail. This Motion is based upon the information from the Defendant's treating physician to be submitted to the Court and Counsel prior to the hearing which indicated that the Defendant's diagnose mental condition has deteriorated and good cause exist to place the Defendant in confinement other than the Davis County Jail.

DATED this _23_ day of September, 1992.

RANDALL GAITHER
Attorney for the Defendant

Exhibit D

36

1   to go to a different environment.  And the doctor feels that

2   would be very helpful if that type of confinement could take

3   place.

4           And it's my understanding the U.S. Attorney --

5           THE COURT:  All of this is in the doctor's letter?

6           MR. GAITHER:  I will jump in my car and go back and

7   obtain it.  I apologize it's my mistake.  The doctor got it

8   to me today.  I made copies and I grabbed the file.  I must

9   have stuck them in the wrong file, and that is my mistake.

10          It's my understanding Mr. Olsen has to leave, and

11  the government does not oppose changing his confinement to

12  the halfway house.  If the Court would like to hear from the

13  government and take a minute, I'll go to listen.

14          MR. OLSEN:  The government has no objection to that

15  request that he be released to a halfway house at this point,

16  that's correct.

17          THE COURT:  Have you talked to Mr. Campbell?

18          MR. OLSEN:  I have.  Through her secretary that

19  information was conveyed to me.

20          MR. GAITHER:  I had explained in advance what the

21  letter would probably say as I talked with her last Monday.

22  In fact I talked with her before that as soon as I heard and

23  had the date set for the Court.

24          THE COURT:  Well, be seated.  I'll talk with the

25  probation agent.

                Exhibit E

                                                              5

1          MR. GAITHER:  Thank you.

2          THE COURT:  Do you have someone at your office that

3    could find that.

4          MR. GAITHER:  While you're talking, I'll see if she

5    can find it and fax it down to the Marshal's office, we

6    should have it by then, or I can be back in five minutes.

7          THE COURT:  Five minutes?

8          MR. GAITHER:  I drive fast.

9          THE COURT:  Where is your office, Mr. Gaither?

10          MR. GAITHER:  Third South and Sixth East.

11          THE COURT:  Okay.  Well, you go get it.  It should

12    be in the file.

13          MR. GAITHER:  Okay.  Thank you.  I will go get the

14    letter.  I'll be right back.

15          THE COURT:  Okay.  We'll be in recess.

16          (Recess.)

17          THE CLERK:  The Court resumes its session.

18          MR. GAITHER:  Your Honor, if I may approach the

19    bench.

20          THE COURT:  You may.

21          Okay.  The letter may be placed in the record.

22          MR. GAITHER:  Yes, that's the original for the

23    Court.  Thank you.

24          THE COURT:  The report from the doctor is one of

25    serious portent and deserves the consideration which you've

6

1   requested.

2          I've talked with the probation agent.  I've

3   determined to correct the three months in jail, jail-type

4   facility, to six weeks, which would mean he had completed

5   that, and then six weeks in the CTC and then three months in

6   a home.

7          MR. GAITHER:  Thank you, Your Honor.

8          THE COURT:  All right.

9          And the sentence will no be corrected.  Thank you.

10         MR. OLSEN:  Thank you.  Your Honor.

11         MR. GAITHER:  Thank you, Your Honor.

12         Your Honor, as far as making the order is

13   concerned, is that my responsibility?

14         THE COURT:  No, it will be the U.S. Attorney.

15         MR. OLSEN:  That only makes sense, of course.

16   Thank you, Your Honor.

17         (Whereupon, the matter was concluded.)

18                      * * *

19

20

21

22

23

24

25

                                                        7

1                    C E R T I F I C A T E

2

3    STATE OF UTAH

4    COUNTY OF SALT LAKE

5

6            I, Karen Murakami, a Certified Shorthand Reporter

7    and Notary Public in and for the State of Utah, do hereby

8    certify that the foregoing transcript of proceedings was

9    taken before me at the time and place set forth herein and

10   was taken down by me in shorthand and thereafter transcribed

11   into typewriting under my direction and supervision;

12           That the foregoing pages contain a true and correct

13   transcription of my said shorthand notes so taken.

14           IN WITNESS WHEREOF, I have hereunto set my hand and

15   seal this _____6th_____ day of ___April___, 1994.

16

17

18

19                    KAREN MURAKAMI, CSR, RPR

20

21   My commission expires:

22   January 14, 1997

23

24

25

                                                              8



Rec
11/30/98
Dn

## PROMISSORY NOTE

Torrance, California                                    November 22, 1995

On or before December 31, 1996, for value received, Robert Jones ("maker") promises to pay to the order of MI, LC a Utah limited liability company ("Payee"), at 10 Mountain Springs Parkway, Springville UT 84663, the sum of $265,000, with interest on the unpaid balance from the date hereof at the rate of six percent (6%) per annum. Each payment shall be credited first to interest then due, and then to principal. Should default be made in the payment of any installment of principal and interest shall, at the election of the holder, become immediately due and payable without notice. Any payment hereunder shall not be deemed to be in default only if not made within ten (10) days of the date when due. If suit be brought on this note to enforce payment, maker promises to pay costs of suit and sum as the court may fix as attorney's fees.

This note may be prepaid, in whole, or from time to time in part at the option of the maker at any time without payment of any premium or penalty. In the event of prepayment in part, interest after prepayment shall accrue only on the unpaid balance.

This note is secured by 519,000 shares (the "Collateral") of the Common Stock of Commonwealth Thrift, a California corporation, represented by Certificates Number 22 and 24. Maker hereby grants a security interest in and to ( the "Collateral") and any proceeds thereof. Payee shall return to Maker, by personal messenger or courier, and release form this security interest, within seven (7) days after payment in full of the outstanding balance of this Note, the certificates representing the Collateral, and the security interest in such shares shall then terminate.

Payee shall be entitled to foreclose upon the Collateral and exercise the rights of a secured party under the California Commercial Code in the event that Maker materially defaults under the provisions of this Note, if default has not been cured within 15 days after notice from Payee to Maker.

**ROBERT JONES**

_____

$EXHIBIT \ F$

## PROMISSORY NOTE

Torrance, California                                September 28, 1994

On or before September 28, 1995, for value received, Robert Jones ("maker") promises to pay to the order of Kenneth Conte ("Payee"), at 4478 Shorebird Dr., Huntington Beach, CA 92649, the sum of $250,000, with interest on the unpaid balance from the date hereof at the rate of six percent (6%) per annum. Each payment shall be credited first to interest then due, and then to principal. Should default be made in the payment of any installment of principal or interest when due, then, or at any time during such default, the entire amount of unpaid principal and interest shall, at the election of the holder, become immediately due and payable without notice. Any payment hereunder shall not be deemed to be in default only if not made within ten (10) days of the date when due. If suit be brought on this note to enforce payment, maker promises to pay costs of suit and such sum as the court may fix as attorney's fees.

This note may be prepaid, in whole, or from time to time in part at the option of the maker at any time without payment of any premium or penalty.  In the event of prepayment in part, interest after prepayment shall accrue only on the unpaid balance.

This note is secured by 519,000 shares (the "Collateral") of the Common Stock of Commonwealth Thrift, a California corporation, represented by Certificates Number 22 and 24. Maker hereby grants a security interest in and to (the "Collateral") and any all proceeds thereof. Payee shall return to Maker, by personal messenger or courier, and release from this security interest, within seven (7) days after payment in full of the outstanding balance of this Note, the certificates representing the Collateral, and the security interest in such shares shall then terminate.

Payee shall be entitled to foreclose upon the Collateral and exercise the rights of a secured party under the California Commercial Code in the event that Maker materially defaults under the provisions of this Note, if default has not been cured within 15 days after notice from Payee to Maker.

ROBERT JONES

*Robert Jones*

EXHIBIT G

