USDC SCAN INDEX SHEET

















LMM   12/7/98   10:09

3:98-CR-00519   USA V. BOGART

*45*

*CRMDFT.*



ORIGINAL

1   Donald W. MacPherson
2   3404 W. Cheryl Dr., #A250
    Phoenix, AZ  85051
3   Ph. 602-866-9566
    Fax 602-866-3799
4   Bar #005627 (Arizona)
    Counsel for Defendant
5
    John Mitchell
6   2445 5th Avenue, #200
    San Diego, CA  92101
7   Ph. 619-237-9155
    Fax 619-237-0128
8   Bar # 032237
    Local Counsel
9

10              IN THE UNITED STATES DISTRICT COURT

11             SOUTHERN DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,    )   CR Case No. 98-0519-JM
                                 )   Sentencing: 12/18/98
13       Plaintiff,              )              8:30 a.m.
                                 )   DEFENDANT CONTE'S
14       v.                      )   MOTION FOR
                                 )   DOWNWARD DEPARTURE
15  RUSSELL J. CONTE,            )
                                 )
16       Defendant.              )
    _____)

17       COMES NOW the DEFENDANT, RUSSELL J. CONTE (CONTE), by and

18  through counsel undersigned, and hereby files his Motion for

19  Downward Departure.  Based on the following memorandum, CONTE

20  requests a downward departure of at least 10 levels.  WHEREFORE,

21  CONTE prays for an order of this Court ordering a downward

22  departure of at least 10 levels.

23  I.   OVERVIEW

24       CONTE, formerly of Utah and now living in Arizona, has plead

25  guilty to one count of wire fraud for his involvement in a

26  fraudulent scheme in which his former Utah friend, MURDOCK, lost

27  approximately $2.7 million.  The investment scheme was devised by

28

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051



45

BOGART, assisted by LUCCI, both of San Diego, who have both likewise plead guilty. It is significant that CONTE was not aware of BOGART'S scheme until _after_ MURDOCK had invested over $1.2 million with BOGART. However, during the initial $1.2 million investment, CONTE misled MURDOCK by not informing MURDOCK that CONTE was to receive 10% of all that MURDOCK invested with BOGART. Moreover, after MURDOCK'S loss of $2.7 million, and prior to any notice to CONTE of a criminal investigation, CONTE took steps toward making MURDOCK whole, including, _inter alia_, payment of restitution of $220,000. CONTE also assigned a note to MURDOCK in the amount of $250,000.

CONTE moves for downward departure on a number of grounds, including, _inter alia_, post-offense/pre-investigation rehabilitation/remorse/super acceptance of responsibility. In the very recent case of U.S. v. Green, 152 F.3d 1202, 1206-08 (9th Cir. 1998) the court affirmed a post sentence rehabilitation downward departure and recognizes, at 1206, "no difference between post-offense rehabilitation and post-sentencing rehabilitation." Thus, the Ninth Circuit has made clear that district courts have the discretion to grant downward departures based upon post-offense rehabilitation.

CONTE also requests downward departure on grounds of diminished capacity: he was diagnosed as bi-polar circa 1991, well before the offense date of 1993. Since the 1991 diagnosis, CONTE has been treated for his bi-polar condition with various medications and even with electric shock treatment. His bi-polar

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

condition is incurable. DR. GUERNSEY, a psychiatrist who initially diagnosed CONTE, will testify at the evidentiary hearing and attest to not only his diagnosis, but the fact that in DR. GUERNSEY'S opinion, CONTE'S mental capacity was significantly reduced and substantially contributed to the commission of the subject offense.

As evidenced by the cases discussed, _infra_, it is clear that diminished capacity in general, and bi-polar in particular, have been greatly misunderstood, or to put it another way, have not been fully appreciated in the context of downward departures. What is now clear is that the Commission has undertaken to expand its recognition of diminished capacity as a ground for downward departure. In fact, the Commission amended §5K2.13, defines "significantly reduced mental capacity" in accord with the decision in U.S. v. McBroom, 124 F.3d 533 (3rd Cir. 1997). November 1, 1998 Amendments, Amendment No. 583. As the Commission's 1998 Application Note 1 to §5K2.13, Amendment No. 583, states:

> The McBroom court concluded that "significantly reduced mental capacity" included both cognitive impairments (i.e., an inability to understand the wrongfulness of the conduct or to exercise the power of reason) and volitional impairments (i.e., an inability to control behavior that the person knows is wrongful). The application note specifically includes both types of impairments in the definition of "significantly reduced mental capacity." (Emphasis added.)

As DR. GUERNSEY will testify, here CONTE understood the wrongfulness of his conduct, but suffered a volitional impairment: CONTE was unable to control behavior that CONTE knew was wrongful. While at first blush this assertion with respect to an educated man

Page 3

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

(several years of college), of high intelligence, a family man with a wife and three children, may appear incredible.  A reading of McBroom and similar cases will bring to light the fact that it is not uncommon that a man of high intelligence and professional background who suffers from a bi-polar condition is unable to control his compulsions.  In fact, McBroom, who suffered from a bi-polar condition, was an attorney.

That CONTE'S doctors prescribed electric shock treatment and that CONTE willingly underwent such treatment attests to the seriousness of CONTE'S condition, and attests to the fact that CONTE has not "made much ado about nothing."  Query:  Who in their right mind would agree to electric shock treatment, unless they trusted their doctor's diagnosis and prognosis?  Here the doctors determined that the patient is bi-polar and electric shock treatment will assist the patient, especially given that prescribed medications have failed to obtain favorable results.

It is significant to note that all of CONTE'S legal problems arose after his bi-polar disorder and about the same time: 91) the Utah state forgery case, 1991 (vacated); (2) the Utah false SSN/tax federal case, 1991; (3) the subject case, 1992.  Thus, the causal relationship is linked in time.

That post-Koon the Ninth Circuit gives wide latitude to the district court in making a downward departure determination is best evidenced by the very recent case of U.S. v. Sanchez-Rodriguez, __ F.3d __ 1998 W.L. 81 855 (9th Cir. 1998) (en banc).  In Sanchez-Rodriguez, decided November 20, 1998, the district court departed

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

from a range of 77-99 months down to a 30-month sentence on various grounds, which sentence was affirmed by the Ninth Circuit.

## II.  EVIDENTIARY HEARING AT SENTENCING

CONTE has requested an evidentiary hearing at time of sentencing with respect to his Motion for Downward Departure. CONTE will call as a witness DR. GUERNSEY and may call other witnesses.

## III. CRIMINAL HISTORY CATEGORY

The probation officer calculated a Criminal History Category of III; the Government objected and added 1 point, which also resulted in a III.  The Defendant's position is the Criminal History Category is II.  See Charts, EXHIBITS 1 and 2, attached.

## IV.  GUIDELINE CALCULATION

CONTE asks for departure of at least 10 levels for a Guideline range of 4-10 months, Zone B, and halfway house/work release. If the court agrees with CONTE and finds no additional 2 points for position of trust, CONTE'S offense level is 18: 6 + 13 + 2 - 3 = 18.  Offense level of 18 and Criminal History Category of II yields 30-37 months, Zone D.  With a downward departure of 10, an offense level of 8 and a Criminal History Category of II yields 4-10 months, Zone B.  If the Government prevails on the position of trust and the court finds Criminal History Category II and departs downward 10 levels, this yields 8-14 months, Zone C.

## V.  GUIDELINE EDITION

As stated in the overview, the Guidelines were amended on November 1, 1998, including an amendment with respect to §5K2.13

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and diminished capacity.  Also relevant to CONTE'S request for downward departure is amendment number 508 with respect to §5K2.0, which embodies the decision of Koon v. U.S., 116 S.Ct. 2035 (1996). As the Commission states,

> The purpose of this amendment is to reference specifically in the general departure policy statement the United States Supreme Court's decision in [Koon].  This amendment (1) incorporates the principle holding the key analytical points from the Koon decision into the general departure policy statement, §5K2.0; (2) deletes language inconsistent with the holding of Koon; and (3) makes minor, non-substantive changes that improve the precision of the language of §5K2.0.

## VI.  THE GREEN DECISION/POST-OFFENSE REHABILITATION

It is clear that in the Ninth Circuit, post-offense rehabilitation is a proper ground for downward departure.  See the 1998 Green decision, discussed, infra.

## VII.  THE McBROOM DECISION/DIMINISHED CAPACITY

McBroom was a lawyer who plead guilty to one count of possession of child pornography, which pornography McBroom downloaded on his computer from the Internet.  "Finding that McBroom was able, at the time of the offense, to absorb information in the usual way and to exercise the power of reason, the district court concluded that McBroom was ineligible for a downward departure."  Id.  In vacating McBroom's sentence and remanding for resentencing, the Third Circuit stated:

> We believe that the district court could have considered the possibility that McBroom suffered from a volitional impairment which prevented him from controlling his behavior or conforming it to the law.  (Emphasis supplied.)

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

At sentencing, McBroom presented, by his uncontradicted affidavit, the sordid details of his past, which included, _inter alia_, sexual abuse by his father until McBroom was 15 years old, alcoholism, cocaine use, acute alcohol-induced pancreatitis, addiction to pornography, including peep show visits and the "wealth of pornography available on the Internet," including child "pornography, bestiality, masochism, bondage, and every imaginable sexual fetish." _Id_. at 533-536. In support of his motion for downward departure, McBroom submitted letters from three medical professionals and in his motion for reconsideration submitted two supplemental reports. In substance, the doctors diagnosed McBroom as having "Cyclothymic Disorder, a bi-polar mood disorder and impulse control disorder." In fact, the district court found "that McBroom suffered from bi-polar disorder, manic depression, and multiple disorders of impulse control," but because the court found that McBroom was able to exercise the power of reason, the court held that McBroom was not suffering from a significantly reduced mental capacity under §52K.13, the court relying on _U.S. v. Johnson_, 979 F.2d 396, 401 (6th Cir. 1992).

The Third Circuit reversed for reasons now adopted by the Guidelines: "significantly reduced mental capacity" contains a volitional component, meaning that the court _should focus on the element of control_. _Id_. at 544, 545. Quoting from the Seventh Circuit, _U.S. v. Poff_, 89 F.3d 368, 370-71 (7th Cir. 1996), the _McBroom_ court found:

> ... Likewise, if an individual is capable of appreciating the nature, quality, and

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

> wrongfulness of certain acts, but is unable to
> control the conduct due to reduced mental
> capacity, §5K2.13 may also apply.   Thus,
> §5K2.13 retains both a "cognitive prong" and a
> volitional prong."

In the words of the Seventh Circuit, in <u>Poff</u>, "a person who knows what he is doing and that it is wrong but cannot control himself is deficient in mental capacity." <u>Id</u>. at 545.   In other words, "our system of criminal justice punishes criminals not because of the act alone, but because of the offender's failure to *exercise his capacity to control his behavior in conformity with the demands of society."* <u>McBroom</u> at 546.

> Justice demands that sentencing courts be able
> to consider an offender's capacity to control
> his behavior before determining an appropriate
> sentence.   <u>§5K2.13</u> provides courts with the
> ability to do just that.   <u>Id.</u>

The <u>McBroom</u> court then went on to discuss the disparity between the circuits.   <u>Compare</u> <u>U.S. v. Hamilton</u>, 549 F.2d 190 (6th Cir. 1991) <u>(per curiam)</u> (gambling disorder; no diminished capacity because defendant able to absorb information and exercise power of reason); <u>U.S. v. Goossens</u>, 84 F.3d 697, 701 (4th Cir. 1996) (anxiety disorder and psychological problems; but defendant was a man of "above average intellectual capacity" possessed a "high level of mental functioning" and "was employed in a responsible position;" no downward departure because defendant above average cognitive function); <u>U.S. v. Withers</u>, 100 F.3d 1142, 1148 (4th Cir. 1996) (depression; no downward departure because defendant able to process information and reason; <u>U.S. v. Edwards</u>, 98 F.3d 1364, 1367 (D.C. Cir. 1996) (no downward departure because defendant able to

Page 8

reason); U.S. v. Barajas-Nunez, 91 F.3d 826, 831 (6th Cir. 1996)
(the condition must affect ability to process information or to
reason to qualify as diminished capacity); U.S. v. Johnson, 979
F.2d 396, 401 (6th Cir. 1992) (defendant able to process
information and to reason; no downward departure; defendant
possessed "considerable mental agility in his professional and
personal affairs") with U.S. v. Chatman, 986 F.2d 1446 (D.C. Cir.
1993) (defendant with significantly reduced mental capacity which
contributed to the commission of the crime should be treated with
lenity); U.S. v. Cantu, 12 F.3d 1506 (9th Cir. 1993) (lenity
appropriate); U.S. v. Weddle, 30 F.3d 532, 540 (4th Cir. 1994)
(lenity for those who cannot control their actions). The circuit
disparity has been put to rest by the 1998 amendment, whereby the
Commission has expressly adopted the McBroom holding and reasoning.

Moreover, there is no "but for" rule applied to diminished
capacity under §5K2.13. The defendant's "significantly reduced
mental capacity" must be a contributing cause of the offense but
need not be the sole cause. See U.S. v. Soliman, 954 F.2d 1012,
1014 (5th Cir. 1992) (depression; child pornography; disorder not
causally linked to the offense); U.S. v. Glick, 946 F.2d 335, 339
(4th Cir. 1991) (stress disorder; transportation of stolen
property; downward departure from level 18 to probation); U.S. v.
Ruklick, 919 F.2d 95, 97-98 (8th Cir. 1990) (distribution of LSD;
remanded, holding that mental illness need not be the "but for"
cause of the offense).

The Ninth Circuit in Cantu recognized that §5K2.13 applies to

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

both mental defects and emotional disorders, treating emotional illnesses in the same way that we do mental abnormalities furthers the purpose of §5K2.13." Id. at 1512. Finally, this is not a case where the court should be concerned about creating an incentive for defendants like CONTE "to comb their personal circumstances in order to find evidence of hardship or misfortune." Withers at 1148. Here, CONTE was diagnosed with his bi-polar condition circa 1991, several years prior to the subject offense conduct.

## VIII.    FACTUAL BACKGROUND[1]

See declarations of CONTE and his wife, Lori, for personal factual background information, Exhibits 3 and 4, respectively. The offense conduct description contained in the PSR makes it sound as if CONTE ab initio, developed the scheme, when in fact it was a scheme devised by LYNN BOGART and CARMEN LUCCI. Moreover, the description of CONTE'S conduct makes it appear as if MURDOCK reasonably relied on CONTE, when in truth, MURDOCK had a chief financial officer, HUGO BOREN, who was involved in the discussions, and in fact, advised MURDOCK against the subject investment. According to CONTE, BOREN indicated that he thought it sounded like a good idea but did not know much about the business; thus, he was against the investment and told MURDOCK as such. MURDOCK, rather than relying on his long-time trusted financial officer, relied on CONTE, who, as known to MURDOCK, was a convicted felon, convicted of defrauding others.

---

[1] Some of this background information is contained also in CONTE'S Objection to the PSR.

Page 10

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

1   In fact, CONTE met BOGART and LUCCI for the first time when

2   MURDOCK met them in Utah in 1993.  Attending that meeting was HUGO

3   BOREN.  At that meeting, or soon after, BOREN expressed to MURDOCK

4   and CONTE his suspicions concerning the investment because he

5   believed that LUCCI was dressed like and acted like a mobster;

6   LUCCI wore a full-length mink coat.  This was not a situation of

7   MURDOCK relying merely on CONTE; rather, MURDOCK, in his typical

8   style as owner of NATURE'S WAY, talked to not only CONTE, but to

9   BOREN and others for advice as to what he should do. {NATURE'S WAY,

10   CONTE believes, is the world's largest manufacturer of vitamins and

11   other supplements.}  Thus, statements such as "more persuasion by

12   RUSSELL," PSR pg. 3, line 32, is at best misleading because MURDOCK

13   continued to rely not only on CONTE, but on others.

14   It was not until MURDOCK had paid $1,280,000 net to BOGART

15   (200 + 650 - 22 + 650 = 1,280) that CONTE became aware of the

16   fraudulent scheme perpetrated on MURDOCK and CONTE by BOGART and

17   LUCCI.  See plea agreement, pg. 8, para. 4.  Before that time, both

18   CONTE and MURDOCK went to San Diego to check out BOGART'S business

19   practices, and BOGART defrauded both CONTE and MURDOCK by showing

20   storage containers with boxes of paper which BOGART claimed

21   evidenced that the investment was valid and solid.

22   CONTE and MURDOCK were very close friends, which friendship

23   began circa 1992.  MURDOCK was undergoing marital problems and in

24   fact was separated from his wife and lived in a condo and kept

25   begging CONTE to live in the condo with him.  CONTE and MURDOCK

26   would spend considerable time together, including not only working

27

28                              Page 11

out, but going to basketball games and restaurants. MURDOCK was very much taken back when CONTE, who was already married, did not have the time to spend with MURDOCK and would not leave his wife and children to live with MURDOCK. In fact, CONTE and his family moved to Arizona for purpose of getting away from MURDOCK, given MURDOCK'S overbearing, controlling, and manipulative personality. MURDOCK'S claim that CONTE "was the key to the entire fraud," PSR page 4, line 36, is belied by the probation officer's recognition that but for BOGART and the scheme devised ab initio by BOGART, there would have been no involvement by CONTE in this MURDOCK fraud.

Of the approximately $616,000 proceeds received by CONTE, $250,000 of that was loaned by CONTE to BOB JONES, president and major stockholder of Commonwealth Thrift, an FDIC thrift, and secured by stock in that bank. Circa early 1995, CONTE told MURDOCK that when the note came due at the end of September, 1995, CONTE would give the proceeds to MURDOCK or if JONES could not pay the note off, CONTE would assign the note to MURDOCK. MURDOCK instructed CONTE to have JONES sign the note with MURDOCK'S company, MI, LC, which was done in November of 1995. Commonwealth was to provide a credit card program designed specifically for sub-prime borrowers. However, some time in the middle of 1996, Commonwealth was taken over by the FDIC regulators due to liquidity problems. In effort to held MURDOCK get his money back, CONTE placed phone calls two or three times a week for four years for follow-up, updates and brainstorming, which should demonstrate

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

CONTE'S post-offense rehabilitation gain, most significantly: CONTE paid MURDOCK back $220,000 in cash and assigned MURDOCK the Jones note for $250,000.

## IX.  DOWNWARD DEPARTURE LEGAL ANALYSIS

### A.  Generally

CONTE presents a number of grounds for downward departure in this case. Some of the cases are pre-Koon, many are post-Koon. In any event, it is obvious that by the U.S. Supreme Court's decision in Koon, and the 1998 Guideline amendments, district courts are given wide latitude with respect to exercising their discretion in granting downward departures on a single ground or even under a cumulative factor test: factors in combination. CONTE has attempted to list the factors for downward departure in an order which he feels appropriate: the most important first.

CONTE recognizes that there might be presented issues which overlap, especially where issues are identified by selected Guideline "buzz words." For example, "cumulative factors (singly and in combination)" is probably really no different than "combination of individual characteristics," which is the same as "other extenuating and mitigating circumstances," which differs little from "fair and reasonable sentence." These Guideline characterizations come from, of course, two sources: the Guidelines and the cases. CONTE does not wish to belabor any points; he merely wants to insure that she "covers all of the bases."

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

B.   <u>Post Conduct Rehabilitation</u>, §5K2.0. This court should consider post conduct rehabilitation. <u>See</u>, <u>e.g.</u>, <u>U.S. v. McBroom</u>, 991 F.Supp. 445 (D. NY 1998) (on remand district court departed downward one level for diminished capacity and two levels for post-offense rehabilitation); <u>U.S. v. Brock</u>, 108 F.3d 31, 33-35 (4th Cir. 1997) (post-<u>Koon</u> decision; post offense efforts at rehabilitation may serve as a basis for downward departure); <u>U.S. v. Sally</u>, 116 F.3d 76, 79-82 (3rd Cir. 1997) (<u>Id</u>.).

In addition, CONTE is entitled to a downward departure for post-offense rehabilitation/super acceptance of responsibility. After the offense and prior to notice of a criminal investigation, CONTE caused MURDOCK to recover a substantial amount of his fraud loss: $220,000 in cash recovered.  CONTE also assigned to MURDOCK a note which CONTE believed was worth $250,000, secured by stock in a company but proven to be worthless, plus CONTE gave MURDOCK a note for the balance owed, plus interest, approximate total amount of $2.5 million plus interest.  Downward departures for both post-offense and post-sentence rehabilitation are permitted by the Ninth Circuit.  <u>See, e.g.</u>, <u>U.S. v. Green</u>, 152 F.2d 1202, 1206-08 (9th Cir. 1998) (post-sentence rehabilitation downward departure affirmed; court recognizes, at 1206, "no difference between post-offense rehabilitation and post-sentencing rehabilitation).

CONTE claims the *following early restitution/rehabilitation/ remorse/etc.* factual basis:

a.   <u>July, 1994</u>.  CONTE paid MURDOCK $100,000;

b.   <u>August, 1995</u>.  CONTE paid MURDOCK $120,000, signed

an agreement to pay all monies back, and assigned a note to MURDOCK in the amount of $250,000, secured by corporate shares and Commonwealth Thrift, a California corporation.

       c.  <u>February, 1998</u>. Indictment. Thus, July, 1994 and August, 1995 are 43 and 30 months, respectively, prior to indictment.

    <u>See</u> <u>also</u> <u>U.S. v. McBroom</u>, 991 F.Supp. 445 (D.N.Y. 1998) (on remand district court departed downward one level for diminished capacity and two levels for post-offense rehabilitation).

    CONTE also raises additional grounds for departure. For example, the court should take into consideration downward departure based on the fact that CONTE was not aware of the grand scheme of BOGART and LUCCI when CONTE initially advised MURDOCK. What CONTE did was fail to disclose to MURDOCK the fact that CONTE was to receive a 10% commission on all monies paid over to BOGART and LUCCI. CONTE did not know, <u>ab initio</u> that BOGART and LUCCI were perpetrating a fraud upon MURDOCK. In other words, CONTE was suckered into the scheme, *no less than* MURDOCK. <u>See</u>, <u>e.g.</u>, Plea Agreement at page 8, para. r:

> <u>After</u> Murdock made the $650,000 investment, <u>defendant found out that the whole investment scheme was a fraud</u>. Instead of telling Murdock, he demanded that Bogart make him a 50% partner in the proceeds of all future investments by Murdock. (Emphasis supplied.)

    By this time, which was after MURDOCK had paid $1,280,000 net to BOGART: 200 + 650 - 220 + 650 = 1,280. That post-<u>Koon</u>[2] the

_____

[2] <u>Koon v. U.S.</u>, 116 S.Ct. 2035 (1996).

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

1  Ninth Circuit gives wide latitude to the district court in making

2  a downward departure determination is best evidenced by the very

3  recent case of U.S. v. Sanchez-Rodriquez, __ F.3d __, 1998 W.L.

4  81855 (9th Cir. 1998) (en banc).  In Sanchez-Rodriquez, decided

5  November 20, 1998, the district court departed from a range of 77 -

6  99 months down to a 30-month sentence on grounds that: (1) the

7  amount of drugs was small; (2) delay in charging and sentence; and

8  (3) waiver of deportation hearing.  The government agreed only as

9  to (3) and appealed on (1) and (2), but the sentence was affirmed

10  by the Ninth Circuit.

11           C.    Diminished Capacity, §5K2.13.  See, e.g., U.S. v.

12  Herbert, 902 F.Supp. 827 (N.D. IL 1995) (embezzlement and tax

13  fraud; downward departure granted after psychiatric evaluation

14  established that defendant had been mentally impaired at the time

15  of the offense, which mental impairment included a severe

16  depressive disorder compounded by a pathological gambling disorder

17  and alcohol dependence).

18           The November 1, 1998 amendment not only applies

19  diminished capacity to a "crime of violence" thus showing greater

20  Commission deference to diminished capacity, but as well as an

21  application note that defines "significantly reduced mental

22  capacity" based on the decision in United States v. McBroom, 124

23  F.3d 533 (3rd 1997).  The McBroom court concluded that

24  "significantly reduced mental capacity" included both cognitive

25  impairments (i.e., an inability to understand the wrongfulness of

26  the conduct or to exercise the power of reason) and volitional

27

28                              Page 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

impairments (i.e., the inability to control behavior that the person knows is wrongful.) The application note specifically includes both types of impairments in the definition of "significantly reduced mental capacity."

The case of U.S. v. Mary Ann Herbert, 902 F.Supp. 827 (N.D. Ill. 1995) is instructive. Herbert plead guilty to embezzlement and tax fraud. In order to "salvage her failing company," she started gambling. Winnings did not cover the debts. Herbert embezzled $70,000 from a pension fund. Herbert's psychiatrist concluded that Herbert suffers "an ongoing psychiatric illness ... [and] displays a number of features which are often seen in individuals with mixed personality states that include narcissistic, histrionic and borderline features." The psychiatrist further explained that Herbert's illness "causes a depressed state prompting Herbert to question her own worth, make poor decisions, and then offer excuses to compensate for her shortcomings." The court ordered a second psychiatric evaluation to determine whether Herbert's psychological difficulties contributed to her criminal actions. The court found that Herbert had, in fact, been impaired at the time of the offense. The psychiatrist stated:

> In my opinion, Ms. Herbert suffered cognitive difficulties (poor concept formation and poor ability to understand or judge situations) and emotionally driven decision making. Her behaviors and thought patterns were influenced by her impaired mental condition which include a severe depressive disorder compounded by a pathological gambling disorder and alcohol dependence. The consequences of her personality disorder which

Page 17

included her feelings of inadequacy (which
impacted upon her ability to lead or
administer a corporation) resulted in
extremely poor decision-making which
consequently led to the charge against her.
Her inability to cope with the sequence of
events resulted in her suicide attempt.

Ms. Herbert's mental state at the time of
the offense was extremely impaired. As a
direct result of an active depressive illness
compounded by her mix personality state, her
perception of her faults and weaknesses, in
addition to her limited coping capacity and
poor judgment subsequently resulted in a
reduced mental capacity during the period of
time immediately preceding, during, and after
the offense.

Relying upon U.S. v. Lewinson, 988 F.2d 1005 (9th Cir. 1993)

and U.S. v. Frazier, 979 F.2d 1227 (7th Cir. 1992), the district

court granted Herbert's request for a downward departure, and

although Herbert's total offense level was 13, she was placed on

probation for a term of 42 months and placed on home confinement

for the first six months of probation.[3]   In granting Herbert a

downward departure, the court stated:

In sum, all that Frazier and Section 5K2.13
require is that (1) the defendant suffered a
diminished mental capacity at the time of the
offense, and (2) the mental impairment
contributed to the commission of the crime.

See also, U.S. v. Speight, 726 F.Supp. 861, 867-869 (D.D.C.

1989) (in determining whether departure was warranted, the fact

that defendant's mental illness and drug addiction might both have

contributed to commission of offense did not bar application of

_____

[3] The reported case does not state the number of levels
departed.  However, a review of the judgment indicates the
Guideline calculation before departure and reveals the
sentence of probation/home confinement.

Page 18

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

mental illness downward departure; defendant's two prior narcotics offenses did not establish need for incarceration of defendant to protect public); U.S. v. McMurray, 833 F.Supp. 1454, 1480-85 (D.Neb. 1993) (bi-polar; diminished capacity warranted downward departure) (the subsequent case history does not concern the issue); U.S. v. Ruklick, 919 F.2d 95, 97 (8th Cir. 1990) (distribution of LSD; remanded, holding that mental illness need not be the "but for" cause of the offense).  In McMurray at 1480-81, we find this discussion of the bi-polar disorder:

> A "bi-polar disorder" is characterized by manic episodes. [Reference to Diagnostic and Statistical Manual Mental Disorders (3rd Ed. revised) (DSM-III-R) at 214]  These manic episodes are characterized by elevated, expansive or irritable moods and "are sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to require hospitalization to prevent harm to self or others."  (Id.)  The "elevated mood may be described as euphoric, unusually good, cheerful or high, often having an infectious quality for the uninvolved observer, but recognized as excessive by those who know the person well." (Id. at 215.)  The "elevated mood" may also turn angry:  "another common associated feature is liability of mood, with rapid shifts to anger or depression." (Id. at 216.)  "Frequently the person does not recognize that he or she is ill and resists all efforts" at treatment. (Id.)

> These episodes begin suddenly, and last from a few days to months. (Id.)  There is often a need for involuntary hospitalization because of the poor judgment exhibited by the person during these periods of time.  (Id.)  The "most common complications of a Manic Episode are Psychoactive Substance Abuse and the consequences of actions resulting from impaired judgments, such as financial losses and illegal activities." (Id.)

The Ninth Circuit case of <u>Cantu, supra</u>, contains a detailed analysis of the Ninth Circuit's view of diminished capacity with respect to a Vietnam veteran who had post-traumatic stress syndrome disorder. At 1512 we find this:

> "Reduced mental capacity," then, comprehends both organic disfunction and behavioral disturbances that impair the formation of reason judgments. Both make a defendant eligible for departure under <u>§5K2.13</u>. Therefore, a defendant suffering from post-traumatic stress disorder, an emotional illness, is eligible for such a departure if his ailment distorted his reasoning and interfered with his ability to make considerate decisions.

Moreover, the Ninth Circuit's liberal view of <u>§5K2.13</u> is demonstrated by its footnote 5 in <u>Cantu</u> at 512, in which the court recognizes that to qualify for diminished capacity downward departure, there is no requirement "that the defendant's condition appeared, as Cantu's does, in the American Psychiatric Association's Diagnostic and Statistical Manual of mental disorders, or even that the defendant suffered from a recognized mental or emotional disease." <u>See also</u>, 128 A.L.R. Fed. 593 (1995) - "Permitting Downward Departure for Defendants with Significantly Reduced Mental Capacity of Non-violent Offenses," especially §5, "Manic/depression;" <u>U.S. v. Christensen</u>, 18 F.3d 822 (9th Cir. 1994) (district court incorrectly concluded that it was without authority to consider whether defendant's bi-polar disorder might warrant a downward departure; downward departure would be based on other than <u>§5K2.13</u> because defendant convicted of crime of violence). <u>Compare</u>, <u>U.S. v. Eagan</u>, 965 F.2d 887 (10th Cir. 1992)

Page 20

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

(denial of downward departure affirmed; court determined defendant fully understood what he was doing; court not applying <u>McBroom</u> test); <u>U.S. v. Moore Bey</u>, 981 F.Supp. 688 (D.D.C. 1997) affirmed 1998 WL 38, 8506 D.C. Cir. 1998 (defendant not entitled to downward departure despite some history of bi-polar disorder; offenses violent; long history of drug abuse); <u>U.S. v. Frazier</u>, 979 F.2d 1227 (7th Cir. 1992) (downward departure from 17 to 6 under §5K2.13; reversed; defendant failed to establish a nexus between diminished capacity and her offense; defendant must show causal relationship; dysthymic[4] disorder; no showing that reduced mental capacity contributed to the commission of the offense; such a link cannot be assumed).

D.   <u>Fraud Loss Overstated as to CONTE</u>.  What we have here is really three schemes to defraud: (1) BOGART'S scheme to defraud MURDOCK and CONTE <u>ab initio</u> ($2.7 million); (2) CONTE'S scheme to defraud MURDOCK with respect to CONTE'S 10% of what MURDOCK would pay BOGART $128,000 (10% of $1.28 million); (3) BOGART and CONTE'S scheme for continuation of defrauding MURDOCK $1.42 million ($2.7 million - $1.28 million).  Under the plea agreement, the parties agree that the fraud loss is in excess of $2.5 million ($2.7 million). (pg. 13)  The agreement also permits CONTE to argue for downward departure <u>on any ground</u>. (pg. 14)  Thus, his downward

---

[4] Dysthymia is defined as "a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression."  <u>Frazier</u> at 1230, quoting from medical dictionary.

Page 21

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

departure argument is simply this: the fraud loss is <u>overstated</u> with respect to CONTE under the following calculation.

The total net fraud loss to MURDOCK was $2.7 million. Of this, MURDOCK lost $1.28 million to BOGART <u>without CONTE knowing</u> that BOGART was engaged in a fraudulent scheme. The only MURDOCK loss at this time foreseeable to CONTE, and the only actual MURDOCK loss with respect to CONTE, was 10% of the $1.28 million, or $128,000. Thus, the loss attributable to CONTE under CONTE'S downward departure analysis is: $1.48 million = 2.7 - 1.28 + .128 (the 10%). Put another way, the fraud loss with respect to CONTE is overstated/over represented. Under the fraud table, <u>§2F1.1</u>, a loss of more than $1.5 million yields an additional 12 points, whereas, more than $5 million yields an additional 14 points, for a difference of 2 points. A downward departure of at least 2 points on this issue is warranted.

E.  <u>Extent of DEFENDANT'S remorse</u>. <u>See</u>, <u>e.g.</u>, <u>U.S. v. Jaroszenko</u>, 92 F.3d 486 (7th Cir. 1996).

F.  <u>Extraordinary acceptance of responsibility</u>. <u>See e.g.</u>, <u>U.S. v. Rogers</u>, 972 F.3d 489, 493 (2nd Cir. 1992) (defendant turned himself in the day after committing the bank robbery); <u>U.S. v. Brown</u>, 985 F.2d 478, 482-83 (9th Cir. 1993) (same); <u>U.S. v. Lieberman</u>, 971 F.2d 989, 996 (3rd Cir. 1992) (defendant paid more in restitution than he actually owed, resigned from position at bank, explained how to detect improper transactions in the future); <u>U.S. v. Miller</u>, 991 F.2d 552, 553-54 (9th Cir. 1993) (remand to determine if extraordinary restitution justified departure).

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

The same facts that apply to CONTE'S post-conduct rehabilitation apply to this factor. _See, e.g._, _U.S. v. Evans_, 49 F.3d 109, 112-115 (3rd Cir. 1995) (remanding for resentencing; relying, in part, on amendment to _U.S.S.G. §5K2.0_ Commentary). In _Evans_, the Third Circuit, citing _Gaskill, infra_, held that a downward departure might be appropriate based on extraordinary acceptance of responsibility where defendant revealed his true identity to probation officer, which otherwise would have remained undiscovered.

G.    _Cumulative factors (singly and in combination)_, §5K2.0. (Old Amendment 508.)    _See_, _e.g._, _U.S. v. Mena_, 968 F.Supp. 115 (E.D. NY 1997) (downward departure of 15 levels based on a number of factors singly and in combination, including _§5K2.12_ coercion and duress because defendant was dominated, manipulated and pressured by his older brother). The Commission in its commentary to the amendment noted that it was not foreclosing the possibility "in an extraordinary case, that a departure could be based upon a _combination_ of individual offending characteristics." _59 Fed.Reg._ 23608, 23610 (May 5, 1994).    _See, e.g._,    _U.S. v. Cook_, 938 F.2d 149, 152-53 (9th Cir. 1991) (court stated that where individual factors would not justify departure, a combination of those same factors may constitute mitigating circumstances justifying a departure).

H.    _Koon departure review standards_.    Under the 1998 amendments, we find an amendment to _§5K2.0_: "This amendment (A) incorporates into the general departure policy statement the

principle holding and key analytical points of the United States Supreme Court's decision in _Koon v. U.S._, 518 U.S. 81 (1996); (B) removes the language that is inconsistent with the _Koon_ holding; and (C) generally enhances the precision of the language of the policy statement."

I.    _Other extenuating and mitigating circumstances_.    See, _U.S. v. Brennick_, 949 F.Supp. 32 (D. Mass. 1996) in which the district court held that defendant's conduct in initially paying his withholding taxes late before he stopped paying them at all, financial conditions in the industry which contribute to the failure of the defendant's business, and the fact that the applicable Guideline overstated the seriousness of the offense, all justified a downward departure.

J.    _Fair and reasonable sentence_.    See, e.g., _U.S. v. Gaskill_, 991 F.2d 82, 86 (3rd Cir. 1993) (court stated that "district judges need not shrink, however, from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence."

## X.    SUMMARY AND CONCLUSION

CONTE'S post-offense rehabilitation/remorse/restitution, all made prior to notice to him of any criminal investigation, warrants _downward departure_.

This is an unusual case of an intelligent, educated individual who suffers from a bi-polar condition. At the evidentiary hearing, through the testimony of DR. GUERNSEY, who treated CONTE and

Page 24

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

diagnosed CONTE well in advance of the subject offense, CONTE will demonstrate to the court that he satisfied the test under §5K2.13 for downward departure for diminished capacity.

CONTE submits additional factors for this court's consideration in awarding downward departure. In sum, CONTE requests at least a 10-level downward departure and a sentence in Zone B, affording CONTE a sentence to a halfway house with work release and continued treatment for his bi-polar condition.

EXHIBITS ATTACHED
1    Guideline Calculations
2    Criminal History Calculation
3    Declaration of Russ Conte
4    Declaration of Lori Conte

DATED this 3 day of December, 1998.

Donald W. MacPherson
3404 W. Cheryl Dr., #A250
Phoenix, AZ  85051
Ph. 602-866-9566
Fax 602-866-3799
Bar #005627
Counsel for Defendant
(Pro Hac Vice Application Pending)

John Mitchell
2445 5th Avenue, #200
San Diego, CA  92101
Ph. 619-237-9155
Fax 619-237-0128
Local Counsel

Copy of the foregoing mailed
this 4th day of December, 1998 date, to:

James Brannigan              Kenneth Ramsdell
Asst. U.S. Attorney          Probation Officer
Federal Building             401 W. A, Suite 500
880 Front Street, Rm. 6293   San Diego, CA  92101
San Diego, CA  92101-8893    Ph. 619-557-5261
Ph. 619-557-65769

_____ a:downwrd.con

The MacPherson Group
A Professional Corporation
Attorneys at Law
3404 West Cheryl Drive
Suite A-250
Phoenix, Arizona 85051

Page 25

## CONTE GUIDELINE CALCULATIONS
### (Before Any Downward Departure)

| | Probation Officer | Government | Defendant |
|---|---|---|---|
| Base Offense Fraud Loss | 6 +13 | 6 +13 | 6 +13 |
| More than minimal planning | + 2 | + 2 | + 2 |
| Position of trust | + 2 --- | + 2 --- | 0 --- |
| Adjusted Offense Level | 23 | 23 | 21 |
| Acceptance of Responsibility | - 3 --- | - 3 --- | - 3 --- |
| Total Offense Level | 20 | 20 | 18 |
| Criminal History Score[1] | 5 | 6 | 3 |
| Criminal History Category | III | III | II |
| GL Range (months) | 41-51 | 41-51 | 30-37 |

Exhibit 1

a:conte\glchtrs.con

---

[1] See Exhibit 2 for calculation.

## CONTE CRIMINAL HISTORY CALCULATION

| §4A1.1 | | Probation Officer | Government | Defendant |
|---|---|---|---|---|
| (c) | Utah Federal Conviction (less than 60 days imprisonment) | 2 | 2 | 1 |
| (c) | Utah State Conviction (vacated) | 1 | 1 | 0 |
| (d) | Offense Committed While on Probation | 2 | 2 | 2 |
| (e) | Offense Committed Within 2 Years of Prior Offense | 0 | 1 | 0 |
| | | --- | --- | --- |
| | Total | 5 | 6 | 3 |

CONTE'S §4A1.1 analysis: The Utah federal conviction resulted in a "sentence of imprisonment" of about 45 days, less than 60 days, thus (c), not (b) applies. The Utah state conviction was vacated, and thus, does not apply. There is no application of (e) because there is no (a) or (b).

Exhibit 2

a:conte\glchtrs.con

## DECLARATION BY RUSS CONTE

The late part of 90 I started having serious panic attacks coupled with night sweats that left me waking up in a pool of sweat. I would have serious bouts of depression where I would not get out of bed for days, to going non stop in a million different directions, all in a sense of urgency, but none of which made any sense or reason. We went to our family doctor, Dr. Morrison, who then referred me to a psychiatrist that he knew who was a specialist in this area.

Up to this point, I had never been to a Psychiatrist and was quite surprised that our doctor felt I needed one, it left me wondering, what in the world a psychiatrist could do to help me with these attacks I was having.    Up to this point when I was in bed I just thought I was coming down with something and feeling the pressures of daily business, thinking that the stress was just getting to me but when the illness never came and mania set in after the depression I would do stupid things feeling like I was invincible and that I could do no wrong, not thinking of the consequences of my actions.  I knew something was wrong (at the time I owned several businesses that many of my friends and relatives had invested in, e.g., trucking company, sand and gravel construction company, finance company, bail bond company, an employment agency, a collection agency, used car sales company). My businesses started to fail due to my lack of presence and inability to make logical intelligent decisions because of my illness.  Interest payments that I had been paying to my investors monthly became harder and harder to make which up to this point I

*Ex. 3*

prided myself on the fact that I had not been late on any of my payments for over a year and in some cases two years.

An example, of my illogical thinking was instead of making logical and good business decisions, when I knew I could no longer continue on this path, I obtained five or so credit cards totaling $26,000 using a fraudulent social security number and alias, using the money to pay, never considering the consequences of using a false name and how I was going to make the next months payments.

The federal government charged me with false financial statement to a federally insured institution, false social security number and defeating and evading taxes. It seems that all of the agencies that were present in my meeting with them wanted a piece of me.

After several meeting and test with Dr. Guernsey, he diagnosed me with Bi-Polar manic depression. I believe this was the beginning of 91. I met with Dr. Guernsey on a weekly basis for about a year and a half trying a myriad of different medications, i.e., antidepressants, anti-mania, etc. but had little success. Dr. Guernsey suggested after a year of different meds. that I have ECT. Not wanting to go to this extreme I continued trying the different meds. Dr. Guernsey was sent to the Gulf War [Army Reserve] and referred me to Dr. Hurst who was continuing the therapy and med treatment. He also was recommending ECT. The therapy was helpful for Lori and me to deal with the illness and understand the many intricacies of the illness. After trying all we could with the meds, we decided to try the ECT.

2

Although being a M.D. Psychiatrist, Dr. Hurst was not qualified to perform ECT and referred me to Dr. Segal who had an excellent reputation as being a good psychiatrist and bi-polar manic depression and qualified to perform ECT.   Dr. Segal tried therapy and meds to make sure they did not work before he tried ECT but met with the same failure as we had had with the other doctors. Sometime in the beginning of 92 (?) I had ECT. I was an inpatient at the hospital for a week where I underwent three treatments of shock treatment.   I was released and had six more treatments as an out patient for a total of about ten treatments in all.

I continued the therapy and meds under Dr. Segal for several months after.   When Dr. Guernsey returned from the Gulf War I stopped seeing Dr. Segal and began seeing Dr. Guernsey (I was seeing Dr. Segal on a weekly basis).   Dr. Guernsey continued the meds and therapy helping me through the difficult time of going through the system. Dr. Guernsey saw me on a weekly basis while I was in prison and continued to prescribe the meds. Dr. Guernsey continued to see me every two weeks until I left for Arizona. In Arizona Dr. Williams has been seeing me since trying different and the latest drugs for my illness.   I am still considering further ECT treatments.

UNDER PENALTIES OF PERJURY I state that the foregoing is true to the best of my knowledge and belief.

Russ Conte

Dated: _12-3-98_

*rconteh.aff

3

## DECLARATION OF LORI CONTE

Russ and I met in 1982 while we were both attending Brigham Young University.  We dated for one year then married in 1983.  Our first child was born a beautiful girl.  Russ had a small collection business while he was in school this is how he supported us.  Our second child, a son, was born two years later.  While I was pregnant, I went back to school to get a nursing degree.  Three years later our third child, a daughter, was born. We were a very happy small family.

Russ continued his collection company which expanded into several other businesses.  Russ continued to do more and more, juggling all his affairs with unusual energy and stamina.  Then one day he seemed to have lost that energy all at once.  He would not get out of bed.  It was so scary to see my husband, all 220 pounds, curled up in bed afraid to get up.  Afraid to face anyone or anything.  After two weeks of his staying in bed and a weight loss of twenty pounds he finally agreed to consult a physician.  He went to a doctor that sent him immediately to a psychiatrist.  He diagnosed Russ right off with Manic Depression, saying he had classic symptoms.  As a nurse I knew very little about the illness and nine years ago there was very little information to be found.  Mainly, what I learned was from my experiences and with talking to others who are close to someone with the illness.

When Russ is manic, he goes one hundred miles an hour, waking up early, going to bed late, very little sleep.  He will get on a subject (it could be anything) and talk about it for hours.  He spends money not thinking.  There is always plenty  of money when

*Ex. 4*

he is manic.  He also has the outlook that anything is possible, and he can do no wrong.  He is always easily agitated when he is manic.  We have learned to stay out of his way when he is angry.

Then, on the other side with the depression, he has a hard time being around people.  He wants to be left alone.  Nothing is right when he is this way.  He stays in bed most of the day, then goes to bed very early.  He is afraid of everything, unable to cope with even the smallest issues.

At first, the depression was the hardest for me to deal with, watching someone you love just lay there unable to help themselves is hard.

Russ had taken out an insurance policy a few months before all of this occurred in case anything should happen to him the family would be taken care of.  When he got sick, I tried to keep things going but there were so many balls he had in the air, I was unable to run the businesses.  The doctors later told me it was the mania that allowed him to do all he was doing and to think it would all work out.  Everything just fell apart.  The businesses failed. Russ continued to bounce from mania to depression.

We did receive money from the insurance but it was very sporadic, sometimes they would go months at a time without paying us.  I would call and call but no one would call back. I remember one time leaving a message crying because they had not paid for months and we were so far behind in all of our bills.

Russ decided to have a series of ECT (electric shock) treatments because the medicine he tried had not worked.  We had

2

hoped the ECT would help with the depression. And it did for a while but he had severe memory loss and during the second to last treatment the doctors were unable to stop the seizure which frightened us.

The charges against Russ in Utah are a blur to me now. It was such a hard time I think that I have blocked it out of my mind. Russ had used friends and family member's money on different investments that he had been doing but when he got sick they also lost their money. Russ beat himself up over this time and time again. Doing this made his illness all the worse. The government brought charges against him for tax evasion and using a false security number to a bank. He was to keep something afloat and in a manic mindset everything was going to workout fine. The process really took its toll after everything we had already gone through. The probation officer recommended probation but the judge went against this giving him a sentence of three months prison and three months home detention (I think). We were devastated!

Through all of our ups and downs we relied very heavily on each other to get through the hard times. So the hardest part was being separated. Russ slept twenty-three hours a day and lost a lot of weight. Sunlight and exercise have been the only two things to truly help. Both of those were taken away there.

After he got out of jail, we pulled ourselves together to get our lives back on track. Ken Murdock, an old friend, started coming over to do things with Russ. Ken never liked me. He always looked down his nose at me. He was having problems with his

3

marriage and wanted to do things with Russ.  Ken enjoyed doing things with Russ, he was different from most men in Utah.

Ken wanted Russ to leave me and our family so Russ would always be available to do what he wanted.

Anyway, Ken was coming between us more and more.  I wanted to move and get away from him.  I also felt that here in Arizona the sun always shining would help Russ feel better when he  was depressed.

Eric (as we knew him as) [Boggart] offered to help us get into a home here.  We found a home and moved to Arizona.  Ken was very upset  we moved. He wanted to build a house on some property he was going to also build on.

All of the stress Russ has been under the last year has affected the depth of his depression.  Dr. Williamson has wanted to do a series of ECT but with the effect, memory loss and prolonged seizure it had last time, we have chosen not to do it at this time.

Bi-Polar is a very confusing illness because the person seems so normal.  The only way to truly understand it us to be around someone when they are normal and then when they are manic and depressed.  My mom says it like living with an alcoholic, the family adjusting to the person who is sick.

The last point I would like to make is how hard we have worked to keep our family together.  Our three children are bright, happy and well adjusted with two parents that want the very best for them.  Russ is a wonderful father, very involved, caring, and loving.  He is also a loving, caring husband.  Russ never

4

intentionally hurt anyone. It has been devastating to him to know Ken lost his money and Russ has lost his friend. And that Ken would intentionally try to destroy not only Russ but his family.

Yes, there are many periods of time that Russ is completely normal. He does not realize when he is manic or depressed until he gets real bad or I point it out to him.

UNDER PENALTIES OF PERJURY I state that the foregoing is true to the best of my knowledge and belief.

Lori Conte

Dated: December 3, 1998

a:contew.aff

5